# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* [UNDER SEAL], | Case: 1:20-cv-01011 JURY DEMAND<br>Assigned To : Leon, Richard J.<br>Assign. Date : 4/15/2020<br>Description: Gen. Civil       (E-DECK) |
| Plaintiffs, | SEAL PURSUANT TO 31 U.S.C.<br>§ 3730(b)(2) |
| vs. |  |
| [UNDER SEAL], | JURY TRIAL DEMANDED |
| Defendants. |  |

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

### DOCUMENT TO BE KEPT UNDER SEAL
### DO NOT ENTER IN PACER/ECF

# UNITED STATES DISTRICT COURT

# DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* SDRF, LLC, a Michigan limited liability company,<br><br>       Plaintiffs,<br><br> vs.<br><br>THOMSON REUTERS HOLDINGS, INC., a Delaware Corporation; THOMSON REUTERS U.S. LLC, a Delaware Limited Liability Company; WEST PUBLISHING CORPORATION, a Minnesota Corporation; and, THOMSON REUTERS (TAX & ACCOUNTING) Inc., a Texas corporation,<br><br>       Defendants. | Civil Action No.<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

## I. INTRODUCTION

1. Relator brings this action to recover damages and civil penalties on behalf of the United States of America arising from false or fraudulent statements, records, and claims made or caused to be made by Defendants or their agents in violation of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"), by knowingly misstating their efforts to subcontract with small business concerns, by knowingly submitting Subcontracting Plans they knew they would not perform, and by knowingly shirking their obligation to make "good-faith efforts" to provide subcontracting opportunities to small businesses within the meaning of Section 8(d) of the Small Business Act, 15 U.S.C. § 637(d).

2. Thomson Reuters is a leading provider of news and information services through traditional print publishing, online publishing, research tools, and other software knowledge

management and workflow products. The multinational company reports more than $5.9 billion

in revenue annually, selling its products to legal professionals, corporations, tax professionals,

government, and news distributors. According to its most recent Annual Report dated March 19,

2020, its largest business unit named "Legal Professionals" receives approximately 15% of its

total revenues (or $360 Million) from government, including Federal, State and Local entities.

3.      Since at least 2011, the federal government has purchased many products and

services from Thomson Reuters: Westlaw and other news and information subscriptions; printed

case reporters, statutes, regulations, and legal treatises; software products for tax and accounting

functions; and more. As a federal government contractor, Thomson Reuters is subject to

contractual and regulatory requirements, including the requirement, applicable to large

businesses selling commercial products to the federal government, that it provide small

businesses with the maximum practicable opportunity to participate in its contract performance

as subcontractors. To provide that opportunity, Thomson Reuters must submit a Subcontracting

Plan to the federal government – and follow through on it. The federal government's Small

Business Subcontracting Program implements national policies set forth by Congress in the

Small Business Act, 15 U.S.C. § 637(d), and any prime contractor that fails to comply in good

faith with small business subcontracting requirements is in material breach of its federal contract.

15 U.S.C. § 637(d)(9). These national policies and programs are especially important today as

the federal government is taking extraordinary measures to support small businesses.

4.      As a company that sells compliance products, Thomson Reuters might seem to be

well-positioned to ensure contract compliance. Calling itself the "Answer Company," it claims

to be "one of the world's most trusted providers of answers, helping professionals make

confident decisions and run better businesses" in the "complex arenas" of "law, tax, compliance, government, and media."

5.      In spite of these claims, however, with respect to its small business subcontracting efforts, Thomson Reuters falls far short of good-faith compliance.  Since at least 2017, the small business Subcontracting Plans Defendants have submitted to the federal government have been pro forma efforts without meaningful input from Thomson Reuters' procurement and sourcing staff – that is, without meaningful input from the people who are responsible for implementing the Subcontracting Plans.  In fact, the vast majority of Thomson Reuters' procurement and sourcing staff have received no training or guidance regarding the company's responsibilities under the Subcontracting Plans.

6.      Internally, Thomson Reuters has acknowledged that its federal contracts require it to have a small business and supplier diversity program, but it has admitted that it has "no formal Supplier Diversity program."  Thomson Reuters' personnel have also documented that "if audited," the company's lack of compliance creates the risk of fines, penalties, and non-renewal of contracts.

7.      For years, Thomson Reuters has known it is falling far short on the small business subcontracting dollar goals and other commitments in its Subcontracting Plans.  The subcontracting goals are erroneously considered by the Company to be no more than mathematical points of reference, untethered to Thomson Reuters' actual small business subcontracting dollars or plans.  Moreover, Thomson Reuters has no processes or policies in place to increase its consideration and use of small business subcontractors in accordance with its Subcontracting Plan.  Thomson Reuters does not maintain source lists of small business and diverse subcontractors, and it does not engage in regular or systematic efforts to identify SBCs

NYDOCS 442888v.1

and award subcontracts to them. There is no statement of support from management for the subcontracting program, and small business subcontracting objectives are not included in relevant employee performance goals.

8.      Thomson Reuters also has failed to keep required records regarding its small business subcontracting and compliance with the Subcontracting Plan. Although Thomson Reuters submits subcontracting data through the federal electronic Subcontracting Reporting System ("eSRS"), that data is inaccurate and, in some cases, reflects subcontract awards to entities that are not, in fact, small businesses.

9.      In short, despite commitments made in its Subcontracting Plans, which were required for Thomson Reuters to secure multiple large federal contracts it was awarded, Thomson Reuters has failed to ensure that small businesses receive the maximum practicable opportunity to participate in the company's federal and other contracts, as required by the Small Business Act. Each time Thomson Reuters submits an invoice to the government, it is impliedly certifying that it has made good-faith efforts to comply with its Subcontracting Plan when, in fact, it has frustrated the purpose of the Small Business Act by knowingly excluding and depriving small businesses of opportunities to compete for subcontracts. Thomson Reuters also has fraudulently induced the government to enter into and maintain its contracts with the company by lying about its good-faith compliance efforts, thereby depriving the government of the chance to direct federal tax dollars to prime contractors that will make sure small businesses receive Congressionally mandated subcontracting opportunities. Every invoice that Thomson Reuters has submitted to the government while knowingly failing to make "good-faith" compliance efforts, within the meaning of the Small Business Act, is false.

NYDOCS 442888v.1

10.     Moreover, good-faith efforts are not ancillary to Defendants' federal contract performance.  Instead, they are deemed material by statute, and breach is punishable with liquidated damages, reflecting the importance of the Government's policy to promote the participation of small businesses in the country's economy.  Defendants, who are major government contractors, should not be permitted to dodge and undermine this policy with impunity.

## II.    PARTIES

### A.    Relator

11.     Relator SDRF, LLC is a Michigan limited liability corporation.  Relator's Managing Member worked for defendant Thomson Reuters Holdings, Inc. and has first-hand knowledge of the facts alleged herein.  "Relator," as used herein, refers to SDRF, LLC and/or its Managing Member.  Relator is an attorney by training.  However, he has never been employed by Thomson Reuters in his capacity as an attorney.

### B.    Defendants

12.     Defendant Thomson Reuters Holdings, Inc., is a corporation organized under the laws of the State of Delaware with its principal place of business in New York, New York.

13.     Thomson Reuters contracts with the United States government through wholly owned subsidiaries, including the following named defendants:

   a.   West Publishing Corporation ("West") is a corporation organized under the laws of the State of Minnesota, with its principal place of business in Eagan, Minnesota.  West's DUNS number is 14-850-8286, and it uses the CAGE code 89101.

   b.   Thomson Reuters (Tax & Accounting) Inc. ("TRTA") is a corporation organized under the laws of the State of Texas, with its principal place of business in

Carrollton, Texas.  TRTA's DUNS number is 11-721-1693, and it uses the CAGE

codes 5VSU6 and 86AH3.

14.     Thomson Reuters U.S. LLC ("TRUS"), is a limited liability company organized

under the laws of the State of Delaware.  TRUS is the immediate owner of TRTA.

15.     Except where otherwise specified, Thomson Reuters Holdings, Inc., West, TRTA,

TRUS, and their agents or employees are collectively referred to herein as "Thomson Reuters."

16.     Thomson Reuters provides news and information-based tools to professionals

through brands such as Westlaw, Compliance Learning, and Legal Tracker.  Before 2018, the

company consisted of three business units: Financial & Risk, Legal, and Tax & Accounting.  In

October 2018, the company sold 55% of its Financial & Risk business to private equity funds

managed by Blackstone, retaining a 45% stake in a new company known as Refinitiv.  Following

the sale, Thomson Reuters was reorganized into five business units: Legal Professionals,

Corporates, Tax Professionals, Reuters News, and Global Print.  While each unit sells different

products in different market segments, through different corporate entities, each is supported in

common business functions such as information technology, accounting, human resources, and

purchasing, by a corporate center that, upon information and belief, operates through defendant

Thomson Reuters Holdings, Inc.

## III.     JURISDICTION AND VENUE

17.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq*.

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 and § 1345.

19.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), which provides

that "[a]ny action under § 3730 may be brought in any judicial district in which the defendant or,

in the case of multiple defendants, any one defendant can be found, resides, transacts business, or

NYDOCS 442888v.1

in which any act proscribed by § 3729 occurred." A substantial part of the proscribed acts, which are the subject of this action, occurred in the District of Columbia, where the General Services Administration ("GSA"), the defrauded agency, maintains its headquarters and administers Defendants' federal contracts. Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2).

20.     The Court may likewise exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants submitted false claims for payment to the GSA in the District of Columbia.

21.     There are no bars to recovery under 31 U.S.C. § 3730(e). Specifically, this suit is not based upon prior public disclosures of substantially similar allegations or transactions in a federal criminal, civil, or administrative hearing in which the Government or its agent was a party; or in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or from the news media. Relator is also an original source of the information alleged in this complaint as defined by 31 U.S.C. § 3730(e)(4)(B). Additionally, the allegations or transactions alleged in this complaint are not the subject of a civil suit or an administrative civil money penalty proceeding to which the Government is already a party.

## IV.     RELEVANT LAW

### A.     The Small Business Act and Federal Goals for Small Business Procurement

22.     The Small Business Act, 15 U.S.C. §§ 631 *et seq.*, recognizes small businesses[1] as essential to the American economic system of private enterprise and free competition. To that end, it is the "declared policy" of the United States of America to "aid, counsel, assist, and

---

[1] The Small Business Administration ("SBA") promulgates specific size standards that define when a business can be considered a "small business concern." *See* 15 U.S.C. § 632; 13 C.F.R. §§ 121.101, 121.102. The SBA bases eligibility on a business's average number of employees for the preceding twelve months or its average annual receipts. 13 C.F.R. § 121.201.

protect . . . the interests of small-business concerns in order to preserve free competitive enterprise" and "maintain and strengthen the overall economy of the Nation." 15 U.S.C. § 631(a).

23.     In furtherance of this policy, the Small Business Act requires that when the federal government obtains goods or services from the private sector, it must ensure that a "fair proportion of the total purchases and contracts or subcontracts for property and services for the Government . . . be placed with small-business enterprises." 15 U.S.C. § 631(a). Federal law requires that federal contracting officers ensure that "procurement strategies used by a Federal department or agency . . . shall facilitate the maximum participation of small business concerns as prime contractors, subcontractors, and suppliers." 15 U.S.C. § 644(e)(1).

24.     As a major consumer of goods and services in the U.S., the federal government recognizes the importance of using its role as a purchaser to benefit small businesses. Congress has explained that the federal government's small business contracting programs enhance market competition and local economic development:

> First, [these] programs . . . are designed to increase and diversify small
>
> contractors with the intent of expanding the federal supplier base. This leads to
>
> increased competition, which results in higher quality, greater product variety,
>
> and lower prices. Second, these contracting initiatives lower barriers to entry in a
>
> wide range of markets for small businesses. This provides greater market access
>
> for small firms' goods and services. From an economic perspective, such access
>
> is critical to generating positive macroeconomic benefits, including higher job
>
> creation, wage growth, and greater income distribution.

H.R. Rep. No. 110-400, at 4 (2007).

NYDOCS 442888v.1

25.    The Small Business Act requires that the federal government set annual goals to direct a percentage of spending dollars – both prime contract dollars and subcontract dollars – to small businesses and certain socio-economic categories of small businesses: small business concerns owned and controlled by veterans ("VOSBs"); small business concerns owned and controlled by service-disabled veterans ("SDVOSBs"); qualified Historically Underutilized Business Zone small business concerns ("HUBZone SBCs"); small business concerns owned and controlled by socially and economically disadvantaged individuals ("SDBs"), including Indian Tribes and Alaska Native Corporations ("ANCs"); and small business concerns owned and controlled by women ("WOSBs"). 15 U.S.C. § 644(g)(1). Small businesses and the separate categories of small businesses are collectively referred to herein as "SBCs." At the end of each fiscal year, federal agencies must report on the extent of participation by each category of SBC.

26.    To prepare the required reports of federal dollars going to SBCs, data is drawn from different sources. For SBC participation as prime contractors, prime contract award data is drawn from the Federal Procurement Data System – Next Generation (FPDS-NG). As relevant here, for SBC participation in subcontracting, data is drawn from the SBA's electronic Subcontracting Reporting System (eSRS), which contains SBC subcontracting data submitted by federal prime contractors. 15 U.S.C. § 644(h)(3).

27.    Because the eSRS data is the government's authoritative source for subcontracting data, it is critical that prime contractors such as Thomson Reuters accurately report their subcontracting data. As described by the SBA, "[c]omplete, accurate, and timely Federal procurement data are essential to increasing Federal small business contract awards and achieving small business contracting goals," and accordingly the "SBA takes a number of steps" to ensure the accuracy of that data. "Preserving the integrity of small business procurement data

9

is essential in ensuring that small businesses have the maximum practicable opportunity to participate in the federal supply chain."[2]

28.    The SBA issues an annual Small Business Procurement Scorecard based on the data reported and collected, and calculates the overall government-wide performance against small business goals, as well as each agency's performance.[3] "The annual Scorecard is an assessment tool to (1) measure how well federal agencies reach their small business and socio-economic prime contracting and subcontracting goals, (2) provide accurate and transparent contracting data and (3) report agency-specific progress."

29.    A range of different programs and regulations operate to ensure that the government's small business spending goals are met and that a fair proportion of federal contract and subcontract dollars is awarded to small businesses.  These programs include small business contract set-asides and sole-source awards, small business contract preference programs, technical assistance for small business enterprises, and the program at issue here: the Small Business Subcontracting Program.

**B.    Federal Small Business Subcontracting Programs and the Requirement for Subcontracting Plans**

30.    Section 8(d) of the Small Business Act, as codified at 15 U.S.C. § 637(d), reiterates the national policy that small businesses "shall have the maximum practicable opportunity to participate" in federal contracts, including as subcontractors, 15 U.S.C. § 637(d)(1), and prescribes actions to ensure that prime contractors provide these opportunities.

---

[2] U.S. SMALL BUSINESS ADMINISTRATION, *FY 2019 Goaling Guidelines*, *available at* https://www.sba.gov/document/report--sba-goaling-guidelines

[3] U.S. SMALL BUSINESS ADMINISTRATION, *Small Business Procurement Scorecard Overview*, *available at* https://www.sba.gov/document/support--small-business-procurement-scorecard-overview

NYDOCS 442888v.1

Every qualifying federal government prime contract must include a statement of this policy, and a commitment from the contractor that it "hereby agrees to carry out this policy in the awarding of subcontracts to the fullest extent consistent with the efficient performance of [the] contract." 15 U.S.C. § 637(d)(2),(3) (a qualifying contract is one valued above a specified threshold that is to be performed in the U.S., with the exception of contracts that are personal in nature). Implementing regulations reiterate the mandate that "Prime contractors . . . selected to receive a [qualifying] Federal contract . . . are responsible for ensuring that small business concerns have the maximum practicable opportunity to participate in the performance of the contract." 13 C.F.R. § 125.3(b)(1).

31.     The procuring federal agency and the prime contractor carry out these obligations by negotiating a Small Business Subcontracting Plan that must be approved prior to the contract award, or any amendment or modification of the contract.  The approved Subcontracting Plan **"shall be included in and made a material part of the contract."**  15 U.S.C.A. §§ 637(d)(4)(A) (negotiated procurements) and 637(d)(5)(B) (advertised procurements) (emphasis added).  A contractor's failure to enter into an acceptable Subcontracting Plan that provides the maximum practicable opportunity for SBCs renders the contractor ineligible for a contract award.  *Id.* at §§ 637(d)(4)(C)-(D) and 637(d)(5)(B); 13 C.F.R. § 125.3(c)(1)(i).

32.     The federal agency contracting officer ("CO") soliciting bids from contractors, evaluates offers in conjunction with the proposed subcontracting plans, with the assistance of Procurement Center Representatives ("PCRs") from the Small Business Administration and Small Business Technical Advisors ("SBTAs") from the General Services Administration. Subpart 19.7 of the Federal Acquisition Regulation ("FAR"), which implements Section 8(d) of the Small Business Act, requires federal contracting officers to ensure that an acceptable

Subcontracting Plan is incorporated into and made a material part of every qualifying Federal contract that is awarded.  FAR § 19.705-5(a); *see also* FAR §§ 52.219-9 and 52.219-16 (solicitation and contract clauses describing the requirements for submission of the Subcontracting Plan, and the details to be included in the plan, with variations based on the type of underlying contract).[4]

33.    Consistent with the mandate of the Small Business Act, each Subcontracting Plan must contain percentage goals for subcontracting with all small business concerns as well as with small businesses in specified socio-economic categories: VOSBs; SDVOSBs; HUBZone SBCs; SDBs, including Indian Tribes and ANCs; and WOSBs.  15 U.S.C.A. § 637(d)(6)(A); *see also* FAR §§ 19.704(a) and 52.219-9(d).  The SBC goal categories in a prime contractor's Subcontracting Plan intentionally align with the federal government's small business spending goals as set forth in Paragraph 25.

34.    In addition, the law requires more than optimistic subcontracting spend goals; each Subcontracting Plan also must describe *how* the contractor intends to achieve its spend goals.  Specifically, a Subcontracting Plan must contain "a description of the efforts" the contractor will take to reach its stated percentage goals and ensure that SBCs will have an equitable opportunity to compete for subcontracts.  15 U.S.C.A. § 637(d)(6)(C).

35.    FAR § 19.704 sets forth a number of additional required elements in a Subcontracting Plan, including, in relevant part:

---

[4] Prior to April 2019, the General Services Administration Acquisition Regulation ("GSAR") also contained solicitation and contract clauses regarding subcontracting plans, at GSAR 552.219-71, 552.219-72, and 552.219-73.  Those sections were repealed "as the requirements of these provisions duplicate the requirements in FAR clause 52.219-9." 84 Fed. Reg. 1410 (Feb. 4, 2019).

NYDOCS 442888v.1

    a.   Percentage goals for subcontracting with different categories of SBCs, as set forth in Paragraph 25;

    b.   A statement of the total dollars to be subcontracted, and the totals to be subcontracted to SBCs in accordance with the percentage goals;

    c.   A description of the principal types of supplies and services to be subcontracted;

    d.   A description of the method used by the prime contractor to develop its numerical subcontracting goals;

    e.   The name of an individual responsible for administering the subcontracting program on behalf of the contractor, and a description of the duties of the individual; *see also* 15 U.S.C. 637(d)(6)(B);

    f.   Assurances that the contractor will submit the required compliance reports to the eSRS and cooperate in any government studies or surveys; *see also* 15 U.S.C. § 637(d)(6)(E); and,

    g.   A description of the types of records that the prime contractor will maintain, including documents reflecting procedures adopted to comply with the requirements and goals in the plan and documents demonstrating the prime contractor's efforts to locate SBCs and to award subcontracts to them; *see also* 15 U.S.C. § 637(d)(6)(G).

*See also* FAR § 52.219-9(d).

36.    For prime contractors who sell commercial items to the government, the prime contractor typically submits a "Commercial Subcontracting Plan." *See* FAR §§ 19.704(d), 52.219-9(g). Unlike construction contractors or specialized equipment manufacturers, contractors who sell commercial items produce the same items for all customers, public or

NYDOCS 442888v.1

private, federal or state.  As a result, commercial prime contractors are not required to identify subcontract spending that is tied to the government's purchases, as opposed to subcontract spending tied to non-government purchases, in their Subcontracting Plans.

37.     A Commercial Subcontracting Plan applies to the contractor's entire production of the commercial items on a corporate, division, or product line basis, and sets forth (i) the contractor's total revenue; (ii) the total amount it spent pursuant to any agreement (other than individual employer-employee agreements) for supplies or services related to that revenue; and (iii) its goals for directing that spending – its subcontract spending – to SBCs and other relevant entities.

38.     For example, a company that contracts to sell widgets to the government may report in its Commercial Subcontracting Plan for the prior year (i) that its total revenue was $1 billion, (ii) that it awarded subcontracts totaling $300 million, and (iii) that its goal is to direct $100 million of that $300 million (33%) to all SBCs, with 5% to WOSBs, 3% to VOSBs, etc. The amount of government purchases is not a factor in the preparation of a Commercial Subcontracting Plan.

39.     For contractors with ongoing contracts to sell commercial items to the government, including contractors with General Services Administration ("GSA") Federal Supply Schedule (Multiple Award Schedule) contracts, Commercial Subcontracting Plans are submitted and negotiated annually, and approved once for all government contracts requiring a Subcontracting Plan for that fiscal year.  FAR § 19.704(d).

40.     Prime contractors report their subcontracting spending to the United States through different methods.  Prime contractors with approved Commercial Subcontracting Plans

NYDOCS 442888v.1

submit annual Summary Subcontract Reports ("SSRs") to the eSRS. The prime contractor must

submit the SSR by October 31 of each year.

41.     The SSR reports on the commercial prime contractor's actual subcontracting over

the prior period setting forth: their total relevant sales, the dollar value of their total subcontract

awards, and the dollar value of all subcontract awards to SBCs and each of the specified sub-

categories of SBCs. The contractor also must enter data regarding the total revenue it received

from federal contracts covered by the Subcontracting Plan in the applicable time period.

42.     The SSR submitted by the prime contractor serves as a progress report, showing

how the contractor performed against the negotiated Subcontracting Plan. Using the example

from Paragraph 38 above, the contractor would report its total subcontract spending – $310

million, perhaps – and the amount of that subcontract spending that went to SBCs: perhaps $90

million to SBCs (29%), $18 million to WOSBs (6%), and $4 million to VOSBs (1%), etc.

43.     As set forth above, the SBC subcontract data submitted by prime contractors in

the eSRS is used by the government to prepare annual small business scorecards and evaluate

whether the federal government is meeting its statutory obligation to ensure that SBCs are given

the maximum practicable opportunity to participate in federal contracts. Prime contractors must

certify the accuracy of the data submitted to eSRS.[5]

**C.     Good Faith Compliance with Subcontracting Plans**

44.     A prime contractor must expressly represent that it will "**make a good faith**

**effort**" to meet the goals outlined in its Subcontracting Plan. 15 U.S.C.A. § 637(d)(6)(I)

(emphasis added). According to the express terms of the Small Business Act, a contractor is in

---

[5] *Electronic Subcontracting Reporting System (eSRS) Quick Reference Recommendation for
Federal Government Employees* (Rev. Apr. 30, 2018), *available at*
https://www.esrs.gov/documents/eSRS_Quick_Reference_for_Agency_Review_of_ISR_Reports
.pdf

"**material breach**" of its contract if it fails to "comply in good faith" with its Subcontracting Plan. 15 U.S.C.A. § 637(d)(9) (emphasis added).

45.    Each contract also calls for **liquidated damages** where the contractor has "failed to make a good faith effort" to comply with its subcontracting obligations. *See* 15 U.S.C.A. § 637(d)(4)(F).

46.    The statutory requirements regarding good faith compliance, material breach, and liquidated damages are each incorporated in the FAR. Section 52.219-16, incorporated into qualifying Federal contracts pursuant to FAR § 19.708(b)(2), provides that failure to make a good faith effort to comply with a Subcontracting Plan "means a willful or intentional failure to perform in accordance with the requirements of the subcontracting plan . . . or willful or intentional action to frustrate the plan." FAR § 52.219-16(a).

47.    Although, for the purpose of calculating liquidated damages, a prime contractor's performance is measured by applying the Subcontracting Plan's percentage goals to the pro rata share of actual subcontracting dollars attributable to Government contracts covered by the Plan, FAR § 52.219-16(b), a contractor's failure to meet its numerical subcontracting goals does not constitute a per se failure to make a good faith effort.

48.    Rather, determining whether a good faith effort has been made requires an assessment of "the totality of the contractor's actions, consistent with the information and assurances provided in its plan." FAR § 19.705-7(d). The following list, "though not all inclusive," are indicia of a failure to make good faith efforts:

       a.    A failure to attempt to identify, contact, solicit, or consider for contract award small business, veteran-owned small business, service-disabled veteran-owned

NYDOCS 442888v.1

small business, HUBZone small business, small disadvantaged business, or

women-owned small business concerns;

    b.   A failure to designate and maintain a company official to administer the

subcontracting program and monitor and enforce compliance with the plan;

    c.   A failure to submit the [required performance reporting], using the eSRS, or as

provided in agency regulations;

    d.   A failure to maintain records or otherwise demonstrate procedures adopted to

comply with the plan; or

    e.   The adoption of company policies or procedures that have as their objectives the

frustration of the objectives of the plan.

FAR § 19.705-7(d); *see also* 13 C.F.R. § 125.3(d) (setting forth criteria used by contracting

officers to evaluate whether a prime contractor has failed to make good-faith efforts).

       49.    The Small Business Act, applicable regulations, and enforcing agencies all

recognize that good faith compliance with a Subcontracting Plan is material to federal contracts.

In 2016, the SBA reiterated this, stating that "[f]ulfillment of the small business subcontracting

plan is not merely ancillary to the objective of a contract.  **Failure of a contractor to comply in**

**good faith with its subcontracting plan is a failure to perform an obligation on which the**

**award of the contract was predicated.**"  81 Fed. Reg. 45833 (July 14, 2016) (emphasis added).

       50.    Liquidated damages assessed for failure to make good-faith efforts "shall be an

amount equal to the actual dollar amount by which the Contractor failed to achieve each

subcontract goal," looking at the actual subcontracting dollars attributable to Government

contracts covered by the Subcontracting Plan.  FAR § 52.219-16(b); *see also* FAR § 19.705-

7(f)(3).  The SBA has emphasized that these liquidated damages are not punitive, but are instead

NYDOCS 442888v.1

"imposed so as to compensate the Government for the contractor's failure to fulfill a material obligation of the contract." 81 Fed. Reg. 45833.

51.    A contractor's failure to perform its Subcontracting Plan also may be considered in any past performance evaluation of that contractor for future contract awards. 15 U.S.C. 637(d)(9); FAR § 19.705-5(a)(1); *see also* Matter of: Graybar, B-410886, 2015 WL 993529 (Comp. Gen. Mar. 4, 2015) (contractor properly excluded from competitive range based in part on its consistent failure to meet its small business subcontracting goals on previous contracts); Matter of: Cajun Constructors, Inc., B-409685, 2014 WL 3695514 (Comp. Gen. July 15, 2014) (upholding agency's "marginal" past performance rating based on protestor's consistent history of failing to meet the small business participation goals after submitting aspirational proposals); Matter of: Sci. Applications Int'l Corp., B-408690.2, 2014 WL 7506633 (Comp. Gen. Dec. 17, 2014) (record showed that protester failed to meet its socio-economic and/or subcontracting goals under four of the five contracts it submitted for evaluation).

**D.    The False Claims Act**

52.    Defendants' misconduct violates the FCA. The FCA was originally enacted during the Civil War. Congress substantially amended the Act in 1986 – and, again, in 2009 and 2010 – to enhance the ability of the Federal Government to recover losses sustained as a result of fraud committed against it. Congress amended the Act after finding that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, required modernization. Congress intended the amendments to create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

NYDOCS 442888v.1

53.     In relevant part, the FCA prohibits: (a) knowingly presenting, or causing to be presented, to the federal government a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and (c) conspiring to violate these provisions.  31 U.S.C. § 3729(a)(1)(A), (B), (G).

54.     "Knowingly" means that a person, with respect to information, "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A).

55.     A record or statement is "material" if "it ha[s] a natural tendency to influence, or [is] capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).

56.     Any person who violates the FCA is liable for a civil penalty of up to $23,331 for each violation, plus three times the amount of the damages sustained by the United States. *See id.* § 3729(a)(1); 85 Fed. Reg. 1832 (Jan. 13, 2020).

57.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery.  The FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

58.     Based on the foregoing laws, Relator seeks, through this action, to recover damages and civil penalties arising from:

> a.     The false or fraudulent claims for payment or approval defendants knowingly presented, or caused to be presented, to the federal government through

NYDOCS 442888v.1

defendants' failure to make a good faith effort to comply with its Subcontracting Plan(s);

    b.   The false records or statements material to false or fraudulent claims for payment or approval defendants knowingly made or used, or caused to be made or used, through defendants' failure to make a good faith effort to comply with its Subcontracting Plan(s); and

    c.   Defendants' conspiracy to violate these provisions.

## V.   ALLEGATIONS

### A.   Defendants' Subcontracting and Purchasing

59.    In order to operate the Westlaw online database, print books and treatises, and produce other goods and services, defendants buy goods and services from third parties: in short, they subcontract, entering into agreements to acquire supplies or services.  According to defendants, they subcontract for the following supplies and services, among others:

    a.   Office supplies and furniture;

    b.   Printing services and supplies, including paper products, chemicals, and bindery supplies;

    c.   Shipping, transportation, and warehouse services;

    d.   Computer and information technology equipment and services;

    e.   Content writing;

    f.   Temporary labor services;

    g.   Professional services, including consultancy services;

    h.   Travel services, meeting, and event planning;

    i.   Rental and leasing; and,

    j.   Repair and maintenance services.

NYDOCS 442888v.1

60.    To comply with their Subcontracting Plan(s), defendants must make good-faith efforts to contract with SBCs for a minimum percentage of these supplies and services, as set forth in the Subcontracting Plan.

61.    Defendant Thomson Reuters Holdings, Inc. operates a "Global Procurement Organisation" also referred to as "Global Sourcing," in which Relator was employed. The Global Sourcing group develops and implements the processes by which Thomson Reuters and its divisions, including West and TRTA, obtain goods and services. The Sourcing Team "partner[s] with the business to strategically acquire quality goods and services, mitigate risk and drive Thomson Reuters corporate objectives." Pursuant to company-wide purchasing policies, Thomson Reuters' divisions go through the Global Sourcing group to acquire certain goods or services. The Global Sourcing group, which employs 50-100 procurement professionals around the world in any given year, is divided into a number of category teams. Each team focuses on specific categories of goods and services. During 2017-2019, the key Sourcing teams within Thomson Reuters were: (i) Technology Sourcing, which handles technology acquisitions, including software and hardware; (ii) Professional Services Sourcing, which handles procurement of business services, technology services, facilities management, shipping, marketing and advertising, contingent labor, consulting services, and human resources services; (iii) Travel / Meetings and Events Sourcing, which handles all business travel and large events; and (iv) Procurement Operations.

62.    Global Sourcing is responsible for all subcontracting activities, including screening, approving, and paying suppliers. Global Sourcing is also responsible for inviting suppliers to submit bids and awarding contracts. Many of Defendants' obligations under its Subcontracting Plan are applicable to these Global Sourcing activities. Defendants use SAP

NYDOCS 442888v.1

Ariba, a software system for procurement and supply chain management, to maintain vendor profile information, manage supplier onboarding, and process purchase orders and supplier payments.

**B.    Defendants' Contracts with the United States**

63.    Defendants currently have multiple contracts with the federal government, including but not limited to the General Services Administration ("GSA"), the Department of Justice ("DOJ"), and FEDLINK.  Pursuant to these contracts, Defendants provide various legal and tax products to the government.

 a.    During the relevant time period, defendant West has contracted with the United States at least through the GSA Schedule 76 – Publication Media, Contract Numbers GS-02F-026DA and GS-02F-0405D; GSA Schedule 70 –Information Technology, Contract Numbers 47QTCA19D00LN and GS-35F-0276W; GSA Schedule 520 – Financial and Business Solutions, Contract Number GS-23F-0387K; DOJ Computer Assisted Legal Research ("CALR"), Contract Numbers 15JPSS19D00000122 and DJJ12C2312; and FEDLINK; Contract Numbers LCFDL19C0015 and LC14C7122.

 b.    During the relevant time period, defendant TRTA has contracted with the United States through at least GSA Schedule 76 – Publication Media, Contract No. GS-02F-0103X.

64.    Under applicable contracts, the services provided by West and TRTA are typically billed on a subscription basis, with monthly invoices submitted to government purchasers as products and services are delivered.

65.    Each contract obligates Defendants to adopt a Subcontracting Plan, update that plan annually, report its subcontracting activity to eSRS annually, and make "good-faith efforts"

NYDOCS 442888v.1

to comply with that plan.  Likewise, each contract deems Defendants' failure to make such good-faith efforts a material breach and imposes liquidated damages as a remedy.

66.      In at least contracting years 2018, 2019, and 2020, Thomson Reuters misrepresented the good faith efforts it would undertake, and had undertaken, to comply with its Subcontracting Plan goals.  Indeed, as Relator witnessed, Defendants made virtually *no effort* to comply with their subcontracting obligations, in material breach of their federal contracts.  Even worse, when Relator first reviewed the Subcontracting Plan prior to the 2019 Plan filing, he pointed out that the company did not have the business processes or employees in place to deliver against the plan commitments.  But he was told that the plan could not be changed and Defendants subsequently filed the Plan anyway, knowingly misrepresenting Defendants' planned activities and notwithstanding Relator's expressed concerns.

## C.      Defendants' Subcontracting Plan Representations

67.      As set forth above, in order to obtain and retain their government contracts, Defendants have to submit Subcontracting Plans.  For example, the solicitation for the recently-awarded CALR-5 contract incorporated FAR § 52.219-9, requiring a small business Subcontracting Plan, and required offerors to submit a small business Subcontracting Plan in accordance with FAR 19.7.  The GSA schedules held by West and TRTA also required Subcontracting Plans.

68.      Defendants submitted and continue to submit Subcontracting Plans on behalf of West and TRTA on an annual basis.  These plans cover a calendar year and are typically submitted by Defendants to the federal government by the end of November.  The Subcontracting Plans are generally "cloned" from one year to the next, with little or no input from the procurement teams that are actually tasked with carrying out the plans.

NYDOCS 442888v.1

69.     The Subcontracting Plans for at least contracting years 2018, 2019, and 2020 expressly require Thomson Reuters to ensure that SBCs "will have the maximum practicable opportunity to participate in contract performance consistent with its efficient performance." These Subcontracting Plans also expressly state, consistent with 15 U.S.C. §§ 637(d)(8) and 637(d)(4)(F), that failure "to comply in good faith with the requirements" of the Subcontracting Plan "shall be a material breach of the contract" and "shall result in the imposition of liquidated damages."[6]

70.     The 2018, 2019, and 2020 Subcontracting Plans each contain projections of (1) total sales, (2) total projected subcontracting, (3) total projected subcontracts to all small businesses, and (4) total projected sales to the required small business sub-categories. The plans include the following goals and projections:

| Category | % | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| Total Sales | | $3.4 billion | $4.9 billion | $5.5 billion |
| Total Subcontracting | | $829 million | $1.7 billion | $1.5 billion |
| All SBCs | 30% | $249 million | $510 million | $434 million |
| VOSBs | 3% | $24.9 million | $51 million | $43.4 million |
| SDVOSBs | 3% | $24.9 million | $51 million | $43.4 million |
| HUBZone SBCs | 3% | $24.9 million | $51 million | $43.4 million |
| SDBCs | 5% | $41.5 million | $85 million | $72.4 million |
| WOSB | 5% | $41.5 million | $85 million | $72.4 million |

---

[6] West's Subcontracting Plan for calendar year 2018 was executed by Ellen Gillespie, a West Vice President for Contract Management, on December 5, 2017. Thomson Reuters U.S., LLC's Subcontracting Plan for calendar year 2019 was executed by Alejandro Medrano, "Manager, Government Contracts Counsel," on November 30, 2018. Thomson Reuters U.S., LLC's Subcontracting Plan for calendar year 2020 was executed by Randy Goetz, Assistant General Counsel, on January 22, 2020. The 2020 Plan was submitted on behalf of both West and TRTA.

NYDOCS 442888v.1

71.     In each of these Subcontracting Plans, Thomson Reuters states that it developed its subcontracting goals using total purchases of goods and services in the prior year, including "actual orders placed with SB/SDB/WOSB/VOSB/SDVOSB/HUBZone small firms," "plus our forecasted improvements" for the next year.

72.     In truth, however, the different percentage goals, which are unchanged year after year, do not bear any relationship to Thomson Reuters' actual spending, and there is no process within Thomson Reuters to actually "forecast improvements." Instead, Thomson Reuters' goals appear to be based only on the government-wide goals of 15 U.S.C. § 644(g), without regard to whether those goals are reasonable, realistic, or attainable.

73.     In October 2017, for example, Thomson Reuters reported the percentage of actual small business spending to the eSRS, illustrating a significant underperformance relative to its goals:

| Category | Plan % | 2017 Reported %[7] |
|---|---|---|
| All SBCs | 30% | 6.5% |
| VOSBs | 3% | 0.1% |
| SDVOSBs | 3% | 0% |
| HUBZone SBCs | 3% | 0% |
| SDBCs | 5% | 0.4% |
| WOSB | 5% | 0.4% |

---

[7] As set forth in more detail below, it is likely that even these numbers, as reported by Thomson Reuters, are incorrect.

NYDOCS 442888v.1

74.     Despite falling dramatically short of its small business spending goals for 2017,
Defendants submitted a 2018 Subcontracting Plan *just one month later* that simply copied-and-
pasted the percentage goals it failed to meet in 2017.

75.     In addition to setting boilerplate numeric subcontracting goals that are
disconnected from their actual activities, Thomson Reuters also annually makes boilerplate
commitments to engage in specific good faith efforts to achieve those goals.  These
commitments are untethered to any existing business processes or any actual or intended actions.

76.     The 2018-2020 Subcontracting Plans each contain a section titled "Description of
Good Faith Effort."  In each year, Thomson Reuters has agreed to take at least "the following
steps to demonstrate compliance with a good faith effort in achieving small business contracting
goals":

    a.  Keep records of all subcontract solicitations worth more than $100,000, indicating
        if SBCs and the various sub-categories thereof were solicited and, if not, why,
        including why an award was not made to an SBC if solicited;

    b.  Document internal activities that guide and encourage company buyers to develop
        small business suppliers;

    c.  Document achievements related to Subcontracting Plan goals;

    d.  Attend procurement conferences and trade fairs for SBCs and the various sub-
        categories thereof;

    e.  Use source lists, guides, and other data to identify SBCs and the various sub-
        categories thereof;

NYDOCS 442888v.1

      f.    Document organizations contacted in searching for SBCs and the various sub-

categories thereof, as well as outreach efforts to relevant trade associations and

business organizations.

77.     Separate sections of the Subcontracting Plans—including "Recordkeeping,"

"Equitable Opportunity," and "Program Administrator"—spell out in detail how Thomson

Reuters purportedly would make these good-faith efforts.  For example, under "Program

Administrator," Thomson Reuters promises to name a Subcontracting Plan Administrator who

will, among other things, review subcontract solicitations to "remove statements, clauses, etc.,

which might tend to restrict or prohibit" SBC subcontractors; "oversee the establishment and

maintenance of contract and subcontract award records"; counsel potential SBC subcontractors;

"develop and maintain an incentive program for buyers that support the subcontracting

program"; and "monitor the company's performance and make any adjustments necessary to

achieve the subcontract plan goals."

78.     As discussed in greater detail below, the foregoing commitments have gone

largely unfulfilled over multiple years.  Relator, who assumed the role of Plan Administrator for

calendar year 2019 only, directly observed Defendants' scattershot compliance efforts as he

endeavored to create the structure necessary to make the good-faith efforts described above.

**D.    Defendants Failed to Make Good Faith Efforts to Achieve the Stated Goals in Their Small Business Subcontracting Plans**

**1.   Relator's Role in Thomson Reuters' Subcontracting**

79.     In 2018, Thomson Reuters asked Relator to oversee supplier diversity activities in

addition to his role as Head of HR, Real Estate and Facilities Management, and Travel Sourcing.

Such activities were previously performed by Michele Thompson, whose title was "Director,

Global Sourcing & Global Head Supplier Diversity."  Ms. Thompson was leaving Thomson

Reuters to join the newly formed company Refinitiv and she was not being replaced.  Ms.

Thompson was the named Administrator on West's Subcontracting Plan for calendar year 2018.

80.    Relator started speaking with Ms. Thompson in January 2018.  Early in their

conversations, Ms. Thompson expressed frustration that Defendants did not invest the necessary

resources to fulfill their supplier diversity obligations.[8]

81.    In January 2018, Ms. Thompson forwarded to Relator a PowerPoint Presentation

titled "Supplier Diversity" that she and Freddie Diaz, Ms. Thompson's manager, prepared and

provided to the then Global Head of Sourcing, Carl Tobiasen, in December 2017.  The 2017

presentation was a plea for a formal supplier diversity program.  It detailed the need to create

formal policies and procedures to meet both federal subcontracting requirements and private

customer demand.  The presentation made clear that Defendants were failing to meet their

contractual obligations to the government as well as private customers.

82.    When Relator began reviewing internal documents provided by Ms. Thompson in

the summer of 2018, he realized that Defendant needed more resources, staff, and new processes

to create and implement a supplier diversity program and comply with the obligations under the

Subcontracting Plan.  He elevated his concerns to Freddie Diaz, Vice President of Technology

Sourcing, and Nicolas Passaquin, Head of Professional Services Sourcing, who encouraged Ms.

Thompson to provide Relator with more information and training.

83.    In total, that training consisted of a WebEx meeting with CVM, a company used

by Defendants to analyze its supplier diversity spending at the end of each year; limited

instruction about how Relator was to gather supplier diversity data for annual reports submitted

---

[8] Internally, Defendants used the term "supplier diversity" to refer to both its small business subcontracting obligations to the government and its commitments to private customers to contract with businesses owned by minorities.

to the government's eSRS reporting system; and a request that GSA provide Relator with access to Defendants' prior eSRS filings.

84.    Defendants had no written procedures regarding small business subcontracting or supplier diversity, and aside from her instructions about eSRS reporting, Ms. Thompson provided little direction regarding submission of the Subcontracting Plans to the government. Most concerning, Ms. Thompson gave Relator a startling instruction: avoid talking to the government about the Subcontracting Plan.  On August 27, 2018, Ms. Thomson wrote: "We also have to be very careful going to the government to ask questions because we are not meeting our spend goals so general questions could cause the government to look into our business further and cause an audit."

85.    Ms. Thompson emphasized to Relator that there was "very little for you to do here – it's mainly entering about 10 numbers or so into the government system."  This highlighted the fact that, within the sourcing organization at Thomson Reuters, compliance with the federal Subcontracting Plans was treated as something to be addressed once per year, when the eSRS report was due.

86.    In November 2018, as Thomson Reuters was preparing to renew its Subcontracting Plan for 2019, Relator was told that he would be named as the Plan Administrator, and he was asked to review and approve the plan.  Fully aware that Defendants lacked any policies or procedures to implement the 2019 Subcontracting Plan, Relator internally sought additional time to "make sure we can resource against the stated goals/commitments." Relator was informed, however, that the end of November deadline for submitting the Subcontracting Plan could not be moved and that the language in the Plan could not be changed.

87.    Concerned that, as the Plan Administrator, he would be signing his name to a Plan that misrepresented Defendants' past and prospective good-faith compliance efforts, on November 12, 2018, Relator sent an e-mail to Langdon Wu, Relator's direct supervisor and Thomson Reuters' then Global Head of Sourcing, and Jennifer Arbuckle, Defendants' Senior Global Sourcing Counsel. He explained that, while Sourcing had been asked to "sign off" on the Subcontracting Plans in prior years, "no Sourcing program was actually put in place to ensure compliance with the commitments in the plan." Because the "commitments in the plan w[ould] require more time and resources than previously dedicated to Supplier Diversity," presenting clear compliance risks, Relator stated that he was not willing to sign off on the plan "without Head of Sourcing visibility and approval." Relator also requested that the Sourcing Leadership team "review the requirements closely and confirm that we will deliver against the statement requirements," and emphasized the need for additional resources to meet the commitments of the Subcontracting Plan.

88.    On the eve of submitting the 2019 Subcontracting Plan two weeks later, Relator again emailed Mr. Wu, writing "we will need to come back to all of the commitments in the Subk plan and ensure we build those actions into the wider-Sourcing 2019 activities." Relator copied Chris Dorsey, a VP of Finance, on the same email, urging him to "own the spend component for Supplier Diversity" and to "formally build this into the Sourcing Finance scope." Relator never received a response from Mr. Dorsey.

89.    Relator's requests for additional resources, clear policies, and executive support fell on deaf ears. Despite his own personal best efforts to perform his functions as the Plan Administrator for calendar year 2019, Relator observed Thomson Reuters falling dramatically short of good faith compliance.

NYDOCS 442888v.1

### 2. Defendants Failed to Ensure that SBCs Would Have an Equitable Opportunity to Compete for Subcontracts

90.     The Subcontracting Plans submitted by Thomson Reuters and approved by the federal government explicitly set forth the efforts Defendants would undertake to ensure that SBCs "have an equitable opportunity to compete for subcontracts." Despite this, Defendants' statements did not accurately reflect Defendants' existing efforts, and Defendants did not meaningfully follow through on their Subcontracting Plan promises.

91.     Under the Subcontracting Plans, Defendants expressly agreed to conduct specific SBC outreach efforts, including contacting minority and small business trade associations; contacting business development organizations; requesting SBC sources from existing government resources; and attending small and minority business trade fairs and procurement conference. Defendants' Subcontracting Plans even list a number of resources that Defendants "have and will [utilize] to identify potential sources" of SBCs, including the federal government's System for Award Management and the directories of various minority- and women-owned contractor organizations.

92.     Defendants also expressly agreed to make "internal efforts to guide and encourage purchasing personnel" to provide opportunities to SBCs, including "presenting workshops, seminars and training programs"; "establishing, maintaining, and using [SBC] source lists, guides, and other data for soliciting subcontracts"; and "monitoring activities to evaluate compliance."

93.     Defendants similarly agreed to assist SBCs in bidding on subcontracting opportunities "to facilitate the participation of such concerns," by "[e]nsur[ing] that [SBCs] are included on the bidders' list for every subcontract solicitation for products and services they are

NYDOCS 442888v.1

capable of providing" and offering "adequate and timely consideration of [SBCs] in all 'make-or-buy' decisions."

94.     In fact, Relator is aware of only minimal outreach efforts consistent with the above commitments – namely, Ms. Thompson's participation in the 2017 National Minority Supplier Development Council conference.

95.     In contrast, Relator is unaware of *any* efforts made by Thomson Reuters – excluding his own – to use the listed resources and organizations to identify SBCs; maintain lists of potential SBC subcontractors; support SBCs in bidding processes; or train purchasing personnel to offer subcontracting opportunities to SBCs.  Indeed, when Relator left the company in late 2019, no policies or procedures existed to perform any of the above activities and ensure inclusion of SBCs in subcontracting activities.

96.     For example, in March 2018, there was discussion of creating a "Supplier Diversity Hub" on Thomson Reuters' website to assist potential diverse subcontractors. However, Thomson Reuters' corporate communications vetoed the creation of such a page. When a woman-owned advertising firm contacted Ms. Thompson in July 2018 to request inclusion on Thomson Reuters' "list of diversified suppliers" – apparently assuming one existed – Ms. Thompson replied, copying Relator, "we don't currently have a registration portal for our diverse suppliers."

97.     In 2018 and 2019, Relator consistently pushed Defendants to build the internal infrastructure and business processes needed to make good-faith compliance efforts.  Although Relator achieved some small improvements, senior management largely resisted his overtures and expressed no interest in developing a resourced and monitored plan to meet its

NYDOCS 442888v.1

Subcontracting Plan goals.  Relator was constantly reminded that the Sourcing function needed to focus its efforts on cost-saving initiatives, not Subcontracting Plan compliance.

98.    When Relator assumed responsibility for administering the Subcontracting Plan, he quickly identified the need for compliance efforts across all the sourcing categories and teams.  In February 2019, he urged Mr. Wu to include – at a bare a minimum – a "Supplier Diversity Objective" for all managers in the sourcing organization, making clear that "the US federal government requires TR to take specific actions in relation to Supplier Diversity (and demonstrate good faith efforts)."  The objective, as drafted by Relator, would have required sourcing managers to "periodically review diverse supplier directories and consider diverse supplier capabilities in connection with Thomson Reuters business requirements."  Rather than approve the objective, Mr. Wu stated via email that he did not think "it [would] work out well," and told Relator to run the proposal by others in the sourcing leadership team.  Relator did so, but received no feedback.  Ultimately, it is unclear whether Defendants adopted any formal objective and, more importantly, whether Sourcing team performance is evaluated against it.

99.    Relator also enrolled Defendants in four supplier diversity organizations that provided access to databases to engage and recruit diverse suppliers: (i) the National Minority Supplier Diversity Council; (ii) the Women's Business Enterprise National Council; (iii) the National LGBT Chamber of Commerce; and (iv) the National Veteran Business Development Council.  Remarkably, to the best of Relator's knowledge, this was the first time Defendants had ever asked its Sourcing staff to register for access to such databases despite expressly representing in at least West's 2018 Subcontracting Plan that they had utilized, and would continue to utilize, such resources to identify small business subcontractors.

100.    Although Relator procured memberships to these organizations and even assigned specific employees to serve as liaisons to them, Defendants had no structure or process in place to ensure that the organizations' small business members were presented with actual bidding opportunities, let alone to track those efforts.

101.    In the end, despite Relators' best efforts, Defendants' senior leadership continued to downplay or ignore their obligation to affirmatively include SBCs in subcontracting opportunities.  This continued to be the case up to Relator's departure from the company in early 2020.

### 3.    Defendants Failed to Adequately Support the Subcontracting Plan with Training or Resources

102.    Defendants similarly told the federal government that they would train "purchasing personnel regarding the intent and impact of Section 8(d) of the Small Business Act on purchasing procedures" and "share supplier diversity related information across the Corporate Sourcing organizations."  But Defendants neither conducted trainings nor shared such information.  Instead, Defendants knowingly ignored their Subcontracting Plan obligations and provided bare-bones resources to implement them.

103.    When Relator became the Subcontracting Plan Administrator, his job description did not even include Subcontracting Plan administration.  This responsibility was handed to him as an afterthought on top of his full-time responsibilities as Global Head of Human Resources, Real Estate and Facilities Management, and Travel Sourcing and only after he questioned who would replace Ms. Thompson in late 2018.

104.    Relator, however, recognized the need for at least one full-time employee dedicated to creating and overseeing a supplier diversity program and the obligations under the Subcontracting Plan.  In September 2018, he raised the issue to Mr. Wu, explaining that other

major companies typically had a least one full-time supplier diversity employee with several

other employees reporting to them.  Mr. Wu refused to mobilize senior leadership to create such

a role.  To Relator's knowledge, this position still does not exist at Thomson Reuters.  Instead,

Relator's Plan Administration role was transferred to Douglas Day, whose full-time job is

Director of Professional Services sourcing, which currently includes HR Services Sourcing, Real

Estate and Facilities, Consulting, Content, Contingent Labor, and Marketing.  In a telephone

conversation with Relator in November 2019, Mr. Day informed Relator that he had very limited

knowledge about supplier diversity and the Subcontracting Plan.

  105. Moreover, the budget for supplier diversity and Subcontracting Plan activities was

only $100,000 in calendar year 2019.  The four supplier diversity organization memberships

purchased by Relator consumed nearly a third of that budget, while another portion went to

CVM Solutions, the company that processed Defendants' spending data for annual government

reporting.  The remaining budget left no room for hiring new employees or acquiring additional

tools to fulfill the obligations of the Subcontracting Plan.

  106. The disinterest in small-business subcontracting is a tone set from the top:

Thomson Reuters' executive management has never offered a public statement in support of

such subcontracting efforts.

  107. Thomson Reuters does have a 67-page Code of Business Conduct and Ethics, but

that document fails to address or offer any support for small-business subcontracting, stating

only that the company seeks "a diverse supply chain that reflects our employee base, customers,

and partners around the world."  It includes no statements in support of specific supplier

diversity goals and a list of "helpful contact information" contains no information about whom to

contact regarding supplier diversity issues.

NYDOCS 442888v.1

108.    Thomson Reuters has also published a "Supply Chain Ethical Code."  That document, however, addresses obligations that Thomson Reuters' subcontractors and suppliers are to meet – for safe working conditions, voluntary employment, anti-bribery, etc.  It does not address any obligations to be undertaken by Thomson Reuters, although it does ask that Thomson Reuters suppliers "on request, provide Thomson Reuters with evidence that [they have] implemented or [are] working toward implementing a supplier diversity program and/or supplier diversity policy.  In the absence of such evidence, Supplier[s] will provide a statement describing [their] current position regarding diversity."  Relator is unaware of any efforts by Thomson Reuters to ensure such down-stream compliance, even though Thomson Reuters' Subcontracting Plans expressly include a "flow down" clause requiring the company to make sure that its major subcontractors adopt their own subcontracting plans.

109.    At bottom, the only resources Defendants appear to have dedicated to good-faith efforts to comply with the Subcontracting Plan are $100,000 and a small portion of one otherwise-occupied employee's time.  This is wholly inadequate in light of Defendants' federal revenues and Subcontracting Plan obligations.

### 4.    Defendants Failed to Maintain the Records Required by Their Subcontracting Plans

110.    Defendants' Subcontracting Plans required rigorous recordkeeping of their good-faith efforts to provide opportunities for SBCs.  Unsurprisingly, Defendants have few, if any, records of their nearly non-existent good-faith efforts.

111.    In their Subcontracting Plans, Defendants expressly state that they "will maintain" records of procedures adopted to comply with their subcontracting obligations, and those records "shall include" (i) SBC source lists; (ii) organizations contacted to locate SBC suppliers; (iii) records on each subcontract solicitation for awards larger than $150,000 indicating whether

NYDOCS 442888v.1

SBCs were contacted, why they were not contacted and, if applicable, why an SBC did not receive the award; (iv) records of outreach efforts to trade associations, business development organizations, conferences and trade fairs, and veterans service organizations; and (v) records of "internal guidance and encouragement provided to buyers" through trainings and performance monitoring to evaluate compliance.

112.    Relator – who performed sourcing functions for Thomson Reuters for more than ten years – was aware of no policies or procedures to document SBC outreach, ensure solicitations included SBCs and track the results, train employees in Subcontracting Plan compliance, or monitor that compliance. His annual goals and performance reviews (and those of other Sourcing managers) never mentioned SBC subcontracting and he received no training on SBC inclusion in subcontract solicitations. When Relator assumed responsibility for Plan administration in late 2018, the transition did not include discussion of policies, procedures, or records because such policies, procedures, and records simply did not exist.

113.    Additionally, although regulations and the Subcontracting Plans required Thomson Reuters to have a supporting written size self-certification (or SAM certification) for every small business included in its small business subcontracting, 13 C.F.R. §§ 121.404(e) and 121.410, and confirm the certification of HUBZone small business concerns, Thomson Reuters did not collect or maintain this information consistent with applicable regulations. *See* 13 C.F.R. § 121.411. Instead, Thomson Reuters relied on "Supplier Data Enrichment" reports from an outside contractor, CVM Solutions, to identify its spending with different categories of diverse suppliers. The CVM Supplier Data Enrichment reports were provided approximately once per year. Upon information and belief, CVM used Thomson Reuters' supplier data, cross-referenced

that data against CVM's own database of suppliers, and provided a report of spending by diverse supplier category, identifying the diverse suppliers used.

114.    Defendants' failure to keep appropriate records is consistent with Michele Thompson's August 27, 2018 instruction to Relator: "be very careful going to the government to ask questions because we are not meeting our spend goals so general questions could cause the government to look into our business further and cause an audit."  An audit, of course, would reveal Defendants' failure to make, let alone document, its good-faith compliance efforts.

### 5.    Defendants Failed to Submit Accurate and Complete Data to the eSRS

115.    As discussed above, Thomson Reuters relies on outside vendor CVM Solutions to analyze its subcontract spending.  Using spending data provided by Defendants, CVM generates Supplier Data Enrichment reports that break down that spending into various diversity subcategories which Defendants then use to complete their eSRS reporting.  However, the diversity categories in those reports do not match the reporting categories for eSRS, and Thomson Reuters appears to have provided inaccurate data to eSRS.

116.    West's October 2017 eSRS reporting is instructive.  That year, West reported $3,070,156 in subcontracts for WOSBs.  But the CVM-provided data did not support that number.  Instead, CVM's report listed West's WOSB spend as only $1,035,619.  Notably, the CVM report listed West's "WBE" – women-owned business enterprise – spend as $2,780,522 and its "MWBE" – minority women-owned business enterprise – spend as $289,634.  Rather than report $1,035,619 in WOSB spending to eSRS, West combined its WBE and MWBE spending to report $3,070,156 as its purported WOSB spending.

117.    Suffice it to say, neither minority women-owned business enterprises nor women-owned businesses are necessarily women-owned *small* businesses, an issue that may be of particular import for Thomson Reuters.  Since at least 2018, Thomson Reuters has maintained a

NYDOCS 442888v.1

very substantial business relationship with Talent Net, a Toronto-based employment placement agency. While Talent Net is women-owned, it is not a WOSB as that term is defined by the SBA. Under SBA regulations, Talent Net would be categorized as either an Employment Placement Agency or Temporary Help Service; to qualify as a small business in either category, a company must have less than $30 million in average annual receipts. 13 C.F.R. § 121.201 (2019). But a September 2019 CVM report attributes $66.7 million in Thomson Reuters spending on Talent Net, placing official SBA small-business status well out of the company's reach.

118.    That same 2019 CVM report reflects WBE "unique spend" of $70.5 million, $66.7 million of which is attributed to Talent Net, while simultaneously reflecting "WOSB" "unique spend" of only $858,011. To the extent that Thomson Reuters is still reporting all of its WBE spending as WOSB spending to eSRS – as it did in 2017 – they are vastly overstating their WOSB spending.

119.    Thomson Reuters' inaccurate reporting flows naturally from its failure to direct CVM to provide a spending analysis of all categories *actually relevant* to eSRs reporting. Logically, Thomson Reuters must report spending to eSRS correlated to the categories in its Subcontracting Plans – total SBC spend; VOSB spend; SDVOSB spend; HUBZone SBC spend; SDB spend (including ANCs and Indian tribes), and WOSB spend. But CVM breaks down spending for only some of these categories. In 2019, for example, CVM provided a spending breakdown for WBE; small businesses; MBE (minority-owned business enterprises); "SELF_SDB"; ANC / Indian Tribe; "VET"; WOSB; EDWOSB (economically disadvantaged woman-owned small business); SDB; DBE (disadvantaged business enterprise); and "Others.

There is no breakdown of HUBZone SBCs and the "VET" category appears to subsume all types of veteran-owned enterprises without disaggregating VOSBs and SDVOSBs.

120.    Another reporting problem arises from "double-counting." As the CVM reports themselves caution, spend within different diversity categories cannot simply be added, and the reports note both "spend" and "unique spend." For example, the spending on a subcontract awarded to a small business that is owned by an African-American female veteran could be reported to eSRS as SBC spending, VBE spending, and WOSB spending. However, to calculate total SBC spending, adding up the value of CVM's identified "Small (SBE)," "Vet," and "WOSB" spending would result in triple-counting of that contract's value.[9]

121.    In addition, the eSRS reporting process, as outlined to Relator, covered only Thomson Reuters' GSA contracts. Relator is unaware of any steps taken by Defendants for Subcontracting Plan compliance efforts or eSRS reporting for other federal contracts that may have been covered by the Commercial Subcontracting Plans, such as the DOJ CALR contracts, FEDLINK contracts, and others. The difference may be substantial: materials provided to Relator by Michele Thompson show GSA revenue between $15 million and $22 million annually, but total federal contract revenue of approximately $130 million from Q4 2015 through Q3 2016, and $144 million in federal contract revenue from Q4 2016 through Q3 2017.

122.    In addition, the eSRS requires reporting entities that failed to meet their subcontracting goals to enter an explanation for that failure. It appears that Defendants consistently failed to provide any explanations, despite consistently underperforming.

---

[9] *Electronic Subcontracting Reporting System (eSRS) Quick Reference Recommendation for Federal Government Contractors* (Rev. June 15, 2017)*, available at* https://www.esrs.gov/documents/eSRS_Quick_Reference_for_Contractors_Filing_an_SSR_Commercial_Report.pdf

### 6. Defendants Adopted Policies that Frustrated the Goals of the Subcontracting Plans

123.    Rather than adopting policies designed to maximize SBC subcontractor participation, Thomson Reuters instead enforced policies that made it more difficult for small businesses to work with them.

124.    The overarching purpose of a Subcontracting Plan is to facilitate – not impede – the entry of small businesses into a company's supply chain.  In fact, Defendants agreed in their Subcontracting Plans to task the Plan Administrator with reviewing subcontract solicitations to "remove statements, clauses, etc., which might tend to restrict or prohibit" SBC subcontractors. As Plan Administrator, Relator was never empowered to perform this duty.

125.    Moreover, at least one small-business subcontractor – a company called Pilot Inc. that provided Defendants with software-based employee coaching under a contract worth only $30,000 – expressed frustration to Relator about the difficulty of complying with various Thomson Reuters' contracting terms as a small business.

126.    More systematically, Thomson Reuters' internal purchasing policies required the company to use existing, approved suppliers who are primarily large companies whenever possible, rather than seek out new suppliers, including small business suppliers.  Employees were cautioned that "[o]n-boarding a new supplier will require internal approval and is time-consuming."  By formally discouraging the use of new suppliers, Thomson Reuters effectively locked in its existing supplier base, despite the fact that the existing supplier base was resulting in substantial underperformance on its SBC participation goals.

127.    Even worse, the Sourcing Group was required to engage in "supplier rationalization" or "supplier optimization," a euphemism for reducing the number of suppliers, and employees' performance reviews included a supplier optimization metric.  With performance

NYDOCS 442888v.1

evaluations (and salary increases) riding on sourcing managers' ability to reduce the number of suppliers in their categories, sourcing employees were effectively discouraged from seeking out new, small business suppliers. Instead, efforts were focused on consolidating purchases with large, global suppliers, in direct conflict with Defendants' Subcontracting Plan obligations.

### E.    Defendants Knew They Were Failing to Comply with Contractual and Regulatory Obligations

128.    Michele Thompson's December 2017 Supplier Diversity presentation clearly shows that Defendants understood both their obligation to make good-faith efforts to fulfill their Subcontracting Plan commitments and their failure to make them.

129.    The presentation's very first slide explicitly states that "**[a] formal Supplier Diversity program does not exist at Thomson Reuters**," even though "[a]ny company that is selling products to the federal government in excess of $700K is required to have a formal diversity program in place with goals for achieving spend targets." The slide then plainly acknowledges Defendants' good-faith effort obligations: "While spend targets are critical there are no penalties for not achieving them as long as a formal diversity program is in place and we are trying to achieve the targets. **The primary issue and concern of the Federal Government with respect to non-compliance is having a plan in place and constantly striving to achieve it.**"

130.    The presentation then recognizes "Potential Consequences" for failing to have a supplier diversity program: "[l]oss of new or renewal revenue opportunities with . . . United States Federal, State & local government"; "[r]isk of fines and penalties in federal government space if audited"; and "[d]eficiency rating[s] from federal government for failing to meet spend goals," which the company had previously received.

NYDOCS 442888v.1

131.    The presentation makes a series of recommendations for creating a formal Supplier Diversity Program, described as "the key to meeting Federal Government requirements."  Chief among them is creating a formal supplier diversity policy and a supplier diversity office to implement it.  Among other things, the presentation also recommends "immediate implementation of formal process and policy to increase consideration and use of diverse suppliers" across all business units; "classify[ing] and captur[ing] diverse spend across all categories for a baseline and ongoing spend"; "inclusion of Supplier Diversity objectives in Thomson Reuters performance goals"; "senior leadership endorsement"; and "a budgeted and resourced program."

132.    The presentation further recommends coordination with and training of sourcing managers to ensure the inclusion of diverse suppliers in bidding processes and the incorporation of diverse spending objectives into annual performance goals, as well as identification of goods and services across the business that could be purchased from diverse suppliers.

133.    In other words, the presentation asked the company to make the good-faith efforts it had committed to in its Subcontracting Plans – at a bare minimum, identifying opportunities to subcontract with small businesses, ensuring employees with subcontracting power are aware of and offer those opportunities to SBCs, and tracking the results to ensure accountability.

134.    The presentation, which Ms. Thompson delivered to the then Global Head of Sourcing, Carl Tobiasen, was ignored by senior management.  And with the exception of reluctantly giving certain managers a supplier diversity goal, Relator saw none of Ms. Thompson's recommendations implemented, despite his ongoing efforts to persuade senior management.

NYDOCS 442888v.1

**F.    The United States Has Been Harmed by Defendants' Fraudulent Conduct**

135.    By failing to make good-faith efforts to fulfill their Subcontracting Plans, Defendants have improperly shifted opportunities away from small businesses, in direct conflict with the Small Business Act and Defendants' federal contracts, which require Defendants to maximize such opportunities.

136.    Since at least 2011, Defendants have generated hundreds of millions of dollars in annual revenues from contracts with the federal government that require good-faith efforts to comply with Subcontracting Plans.  Each invoice submitted by Defendants to the federal government for products sold under those contracts was rendered false by Defendants' knowing failure to make those good-faith efforts, which were material parts of each federal contract.  *See* 15 U.S.C.A. § 637(d).

137.    With each request for payment, Defendants impliedly certified that they had made good-faith compliance efforts.  As discussed at length above, these implied certifications were false because Defendants deliberately chose to forgo good-faith compliance efforts year after year.

138.    Even worse, by hiding its non-compliance from the SBA, GSA, and other federal agencies, Defendants not only dishonored the terms of its agreements with those agencies, but, more importantly, caused the Government to pay out hundreds of million in funds in the mistaken belief that it was furthering the aims of the Small Business Contracting program.

139.    Alternately, Defendants fraudulently induced the government to enter into and renew federal contracts by repeatedly lying in its Subcontracting Plans about the good-faith efforts it had undertaken and would undertake to ensure that small businesses would have the maximum practicable opportunity to participate in its contract performance as subcontractors.

Each claim submitted by Defendants to the government for services rendered under fraudulently induced contracts was false.

## VI.     CAUSES OF ACTION

### COUNT I

### False Claims – 31 U.S.C. § 3729(a)(1)(A)

140.     Relator alleges and incorporates by reference the allegations made in Paragraphs 1 through 139 of this Complaint.

141.     By virtue of the acts described above, Defendants knowingly submitted or caused to be submitted to the United States Government false or fraudulent claims for payment in violation of 31 U.S.C. § 3729(a)(1)(A).  Each of these requests for payment constitutes an actionable false claim under the False Claims Act.

142.     The United States, unaware of the falsity of the records, statements, or claims made by the Defendants, paid the Defendants for claims that would otherwise not have been allowed.

143.     By reason of these payments, the United States Government has been damaged in an amount to be determined at trial.  In addition, the United States is entitled to penalties for each and every false or fraudulent claim made or caused to be made by Defendants.

Wherefore, Relator prays for relief as set forth below.

### COUNT II

### False Claims – 31 U.S.C. § 3729(a)(1)(B)

144.     Relator alleges and incorporates by reference the allegations made in Paragraphs 1 through 143 of this Complaint.

145.     Through the acts described above and otherwise, the Defendants, and their agents and employees, knowingly made, used, and/or caused to be made or used false records and

NYDOCS 442888v.1

statements in order to get such false and fraudulent claims paid and approved by the United States Government.

146.    The United States, unaware of the falsity of the records, statements, or claims made by the Defendants, paid the Defendants for claims that would otherwise not have been allowed.

147.    By reason of these payments, the United States Government has been damaged in an amount to be determined at trial.  In addition, the United States is entitled to penalties for each and every false or fraudulent claim made or caused to be made by Defendants.

Wherefore, Relator prays for relief as set forth below.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendants as follows:

148.    That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions, as well as civil penalties against Defendants for each violation of 31 U.S.C. §§ 3729 *et seq*.;

149.    That Relator be awarded all costs and expenses of this action, including attorney's fees, litigation expenses, and post-judgment interest;

150.    That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d); and

151.    That the United States and Relator receive all such other relief as the court deems just and proper.

## VIII.    JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury.

NYDOCS 442888v.1

April 10, 2020

**CONSTANTINE CANNON LLP**

Max Voldman (D.C. Bar No. 1030125)
mvoldman@constantinecannon.com
CONSTANTINE CANNON LLP
1001 Pennsylvania Avenue, N.W., Ste. 1300N
Washington, D.C. 20004
Phone: (202) 204-3500
Fax:    (202) 204-3501

Anne Hayes Hartman (CA State Bar 184556)
ahartman@constantinecannon.com
Leah Judge (CA State Bar 302406)
ljudge@constantinecannon.com
CONSTANTINE CANNON LLP
150 California Street, Ste. 1600
San Francisco, CA  94111
Phone: (415) 639-4001
Fax:    (415) 639-4002

Attorneys for *Qui Tam* Plaintiff-Relator

NYDOCS 442888v.1